IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CATHY BROOKS

    *Plaintiff,*

v.

AMERICAN MEDICAL SYSTEMS, INC.,
and AMERICAN MEDICAL SYSTEMS
HOLDING, INC.

    *Defendants.*

_____/

MDL: 2325

Case No.: 2:12-cv-3218

## COMPLAINT

1.    Plaintiff, Cathy Brooks brings this case against Defendants, American Medical Systems, Inc. ("AMS") and American Medical Systems Holding, Inc. (AMS HOLDINGS) (collectively referred to herein as "Defendants"), for the injuries arising from the implantation of a pelvic mesh medical device into Cathy Brooks that was negligently manufactured and designed by Defendants and failed to contain appropriate and significant warnings relating to its use.

### PARTIES

2.    Plaintiff is a resident and citizen of Houston, Texas located in Harris County.

3.    Defendant AMS is a Delaware Corporation with its principal place of business at 10700 Bren Road West, Minnetonka, Minnesota, 55343. At all times material hereto, AMS did business in Texas.

4.    Defendant AMS HOLDINGS is a wholly-owned subsidiary of ENDO. AMS HOLDINGS is the parent of wholly-owned subsidiary AMS.

### JURISDICTION AND VENUE

5.    This is an action for damages in excess of $75,000.00, exclusive of interest, costs,

1

and attorneys' fees.

6. At all times material hereto, Defendants did business in the state of Texas. Additionally, Defendants had contacts and did business in West Virginia. Accordingly, this Court has diversity jurisdiction pursuant to 28 U.S.C § 1332.

7. Venue is proper under the order on the judicial panel on multidistrict litigation and the Pretrial Order #1 paragraph 2 dated February 29, 2012 by Honorable Judge Joseph R. Goodwin.

8. All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

## FACTUAL BACKGROUND

9. Defendants at all times material hereto, were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and selling such devices, including the SPARC Sling (also referred to herein as the "Medical Device" or "Product").

10. The SPARC Sling is an implantable medical device designed to treat Stress Urinary Incontinence ("SUI") and relieve the discomfort and bladder control issues that accompany SUI.

11. Defendants' Product contains monofilament polypropylene mesh and/or collagen. Despite claims that polypropylene is inert, the scientific evidence shows that this material, as implanted into the female pelvic area, is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with Defendants' Product. This negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Furthermore, Defendants'

collagen products cause hyper-inflammatory responses leading to problems including chronic pain and fibrotic reaction. Defendants' collagen products disintegrate after implantation in the female pelvis. The collagen products cause adverse tissue reactions, and are causally related to infection, as the collagen is a foreign organic material from animals. Cross linked collagen is harsh upon the female pelvic tissue. It hardens in the body. When mesh is inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

12. Defendants sought and obtained FDA clearance to market the Product under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the Product.

13. On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are not rare" (emphasis in original). Pelvic mesh for the treatment of SUI is similarly defective such that any statements made by the FDA with respect to POP [pelvic organ prolapse] devices should have placed Defendants on notice of the defects and hazards associated with their POP and SUI products.

14. The FDA Safety Communication also stated, "Mesh contraction (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal

pain" (emphasis in original).

15. In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

16. The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

17. The types of injuries Cathy Brooks suffered are reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

18. The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks.

19. Specifically, the FDA Safety Communication stated that "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

20. Contemporaneously with the Safety Communication, the FDA released a publication entitled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not

experienced by patients who undergo traditional surgery without mesh."

21. The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk" (emphasis in original).

22. The FDA White Paper further stated that "these products are associated with serious adverse events . . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

23. In its White Paper, the FDA advised doctors to, inter alia, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications."

24. The FDA concluded its White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

25. Defendants knew or should have known about the Product's risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

26. Defendants knew or should have known that the Product unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

27. The scientific evidence shows that the material from which Defendants' Product

is made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Product, including Cathy Brooks.

28. This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Cathy Brooks.

29. The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Product was unreasonably susceptible to degradation and fragmentation inside the body.

30. The Product was unreasonably susceptible to shrinkage and contraction inside the body.

31. The Product was unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

32. The Product has been and continues to be marketed to the medical community and patients as a safe, effective, and reliable medical device, implanted by safe, effective, and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of pelvic organ prolapse and SUI, and other competing products.

33. Defendants omitted the risks, dangers, defects, and disadvantages of the Product, and advertised, promoted, marketed, sold, and distributed the Product as a safe medical device when Defendants knew or should have known that the Product was not safe for its intended purposes, and that the Product would cause, and did cause, serious medical problems, and in

some patients, including Cathy Brooks, catastrophic injuries.

34. Contrary to Defendants' representations and marketing to the medical community and patients, the Product has high rates of failure, injury, and complications. The Product also fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Cathy Brooks, making them defective under the law.

35. The specific nature of the Product's defects includes, but is not limited to, the following:

    a. the use of polypropylene and collagen material in the Product and the immune reactions that result from such material, causing adverse reactions and injuries;

    b. the design of the Product to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    c. biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

    d. the use and design of arms and anchors in the Product, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

    e. the propensity of the Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

    f.    the inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (*e.g.*, intercourse, defecation, walking);

    g.    the propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

    h.    the hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

    i.    the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

    j.    the adverse tissue reactions caused by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

    k.    the harshness of cross-linked collagen upon the female pelvic tissue, and the hardening of the product in the body; and

    l.    the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

36.    The Product is also defective due to Defendants' failure to adequately warn or instruct Cathy Brooks and/or her healthcare providers of subjects including, but not limited to, the following:

    a.    the Product's propensities to contract, retract, and/or shrink inside the body;

    b.    the Product's propensities for degradation, fragmentation and/or creep;

c. the Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d. the rate and manner of mesh erosion or extrusion;

e. The risk of chronic inflammation resulting from the Product;

f. the risk of chronic infections resulting from the Product;

g. the risk of permanent vaginal or pelvic scarring as a result of the Product;

h. the risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i. the need for corrective or revision surgery to adjust or remove the Product;

j. the severity of complications that could arise as a result of implantation of the Product;

k. the hazards associated with the Product;

l. the Product's defects described herein;

m. treatment of SUI with the Product is no more effective than feasible available alternatives;

n. treatment of SUI with the Product exposes patients to greater risk than feasible available alternatives;

o. treatment of SUI with the Product makes future surgical repair more difficult than feasible available alternatives;

p. use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q. removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

  r. complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

37. Defendants have underreported information about the propensity of the Product to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Product through various means and media.

38. Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Product.

39. Defendants failed to design and establish a safe, effective procedure for removal of the Product, or to determine if a safe, effective procedure for removal of the Product exists.

40. Feasible and suitable alternatives to the Product have existed at all times relevant that do not present the same frequency or severity of risks as does the Product.

41. The Product was at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

42. Defendants provided incomplete and insufficient training and information to physicians regarding the use of the Product and the aftercare of patients implanted with the Product.

43. The Product implanted in Cathy Brooks was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants.

44. The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Product include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia

(pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain.

45. In many cases, the women have been forced to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

46. The medical and scientific literature studying the effects of Defendants' mesh products, like that of the product(s) implanted in Cathy Brooks, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Product.

47. Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

48. At all relevant times herein, Defendants continued to promote the Product as safe and effective even when no clinical trials had been done supporting long-term or short-term efficacy.

49. In doing so, Defendants failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Product.

50. Due to defects in design, manufacture, and warnings, Defendants' SPARC Sling System implanted in Cathy Brooks was unreasonably dangerous at the time it left Defendants' control.

**Plaintiff's Experience and Injuries**

51. On February 2, 2006, Cathy Brooks was implanted with Defendants' SPARC Sling System which was designed, manufactured, packaged, labeled, marketed, and sold by Defendants.

52. The Medical Device was implanted in Cathy Brooks with the intention of treating her SUI, a use for which Defendants marketed and sold this Product.

53. At all times relevant hereto, Defendants' Product that was implanted in Cathy Brooks was used for the purposes that Defendants marketed.

54. After, and as a result of the surgical implantation of Defendants' Medical Device, Cathy Brooks suffered serious injuries, including, but not limited to: mesh erosion, continued urinary incontinence, dyspareunia, pelvic pain, bladder infections, anxiety, depression, and other injuries similar to the ones described in the FDA's Public Health Notification of October 20, 2008 and July 13, 2011.

55. These injuries would not have occurred but for the defective nature of the Product implanted and/or Defendants' wrongful conduct.

56. As a result of having the SPARC Sling System implanted, Cathy Brooks has experienced significant mental and physical pain and suffering, undergone multiple surgeries and revisionary procedures, and sustained permanent injuries.

**COUNT I**
**(Strict Liability – Defective Design or Manufacture)**

57. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 56 of this Complaint as though fully set forth herein.

58. Defendants placed the SPARC Sling System into the stream of commerce with actual or constructive knowledge that it would be used without inspection for defects.

59. The Medical Device was defective in its manufacture or design.

60. Because of defects in the Medical Device, they are, and at all times material hereto were, unreasonably dangerous.

61. As a direct and proximate result of the defective and unreasonably dangerous Medical Device, Cathy Brooks has suffered serious and permanent injuries, including, but not limited to: mesh erosion, continued urinary incontinence, dyspareunia, pelvic pain, bladder infections, anxiety, depression, and other injuries similar to the ones described in the FDA's Public Health Notification of October 20, 2008 and July 13, 2011, which have resulted in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, aggravation of a preexisting condition, and interest on the foregoing. The foregoing losses and injuries are either permanent or continuing and Cathy Brooks will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully demands that this Honorable Court enter judgment against Defendants, jointly and severally, for damages together with costs of this action, and demand trial by jury of all issues raised herein.

## COUNT II
### (Strict Product Liability – Failure to Warn)

62. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 61 of this Complaint as though fully set forth herein.

63. The Medical Device implanted in Cathy Brooks was defective and unreasonably dangerous when it left the possession of Defendants in that they contained warnings which were inadequate and insufficient to alert physicians or consumers to the dangerous risks associated with the products, including, without limitation, extreme pain, bladder spasms, continued urinary incontinence, and other injuries similar to the ones described in the FDA's Public Health

Notification of October 20, 2008 and July 13, 2011.

64. The Medical Device implanted in Cathy Brooks was used for its intended purposes, i.e., the correction of SUI.

65. Cathy Brooks's physicians, including the surgeon who performed the implantation of the Medical Device, could not have discovered any defect with the Product through the exercise of care.

66. Cathy Brooks's physicians, including the surgeon who performed the implantation of the Medical Device, did not have substantially the same knowledge that an adequate warning from the manufacturer or a distributor would have communicated.

67. The warnings provided by Defendants regarding the Medical Devices were ambiguous or were not sufficient, accurate or clear.

68. Defendants had a continuing duty to warn Cathy Brooks or her doctors of the dangers associated with the Medical Device.

69. As a direct and legal result of Defendants' failure to warn, Cathy Brooks has suffered serious and permanent injuries, including, but not limited to: mesh erosion, continued urinary incontinence, dyspareunia, pelvic pain, bladder infections, anxiety, depression, and other injuries similar to the ones described in the FDA's Public Health Notification of October 20, 2008 and July 13, 2011, which have resulted in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, aggravation of a preexisting condition, and interest on the foregoing. The foregoing losses and injuries are either permanent or continuing and Cathy Brooks will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully demands that this Honorable Court enter judgment against Defendants, jointly and severally, for damages together with costs of this action, and demand trial by jury of all issues raised herein.

## COUNT III
### (Negligence)

70. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71. Defendants owed a duty to Cathy Brooks and others similarly situated as foreseeable users of the Medical Device to manufacture and sell the Medical Device so that it would be reasonably safe for its intended uses and free from defects.

72. Defendants were negligent in designing, manufacturing and selling the Medical Device by, among other things, failing to properly fabricate the Medical Device, failing to adequately test the Medical Device, and failing to conduct adequate quality control procedures for the Medical Device.

73. As a direct and proximate result of the foregoing negligence of Defendants, Cathy Brooks has suffered serious and permanent injuries, including, but not limited to: mesh erosion, continued urinary incontinence, dyspareunia, pelvic pain, bladder infections, anxiety, depression, and other injuries similar to the ones described in the FDA's Public Health Notification of October 20, 2008 and July 13, 2011, which have resulted in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, aggravation of a preexisting condition, and interest on the foregoing. The foregoing losses and injuries are either permanent or continuing and Cathy Brooks will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully demands that this Honorable Court enter judgment against Defendants, jointly and severally, for damages together with costs of this action, and demand trial by jury of all issues raised herein.

## COUNT IV
### (Breach of Warranty)

74. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 73 of this Complaint as though fully set forth herein.

75. Defendants impliedly warranted to Cathy Brooks and all others similarly situated that the Medical Device was reasonably fit for its intended uses and that it was designed, manufactured, and sold in accordance with good design, engineering, and industry standards.

76. The Medical Device was defective in its manufacture or design and was therefore, not fit for its intended uses and was not designed, manufactured, or sold in accordance with good design, engineering, and industry standards.

77. Defendants breached the above warranties in that the Medical Device was defective as set forth above, was not fit for its intended uses, and was not designed, manufactured, or sold in accordance with good design, engineering, and industry standards.

78. As a direct and proximate result of the foregoing breaches of warranties, Cathy Brooks has suffered serious and permanent injuries, including, but not limited to: mesh erosion, continued urinary incontinence, dyspareunia, pelvic pain, bladder infections, anxiety, depression, and other injuries similar to the ones described in the FDA's Public Health Notification of October 20, 2008 and July 13, 2011, which have resulted in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, aggravation of a preexisting condition and interest on the foregoing. The foregoing losses and injuries are either permanent or continuing and Cathy Brooks will

suffer the losses in the future.

WHEREFORE, Plaintiff respectfully demands that this Honorable Court enter judgment against Defendants, jointly and severally, for damages together with costs of this action, and demand trial by jury of all issues raised herein.

## COUNT V
### (Punitive Damages)

79. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 78 of this Complaint as though fully set forth herein.

80. Defendants sold the Product to Cathy Brooks's healthcare providers and other healthcare providers in the state of implantation, throughout the United States, and elsewhere without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

81. Defendants sold the Product to the Cathy Brooks's healthcare providers and other healthcare providers in the state of implantation, throughout the United States, and elsewhere in spite of their knowledge that the Product can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this complaint, thereby causing severe and debilitating injuries suffered by Cathy Brooks and numerous other women.

82. Defendants ignored reports from patients and healthcare providers throughout the United States and elsewhere of the Product's failures to perform as intended, which lead to the severe and debilitating injuries suffered by Cathy Brooks and numerous women. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Product's designs or the processes by which the Product is manufactured as the cause of these injuries, Defendants instead chose to continue to market and sell the Product as safe and effective.

83. Defendants knew the Product was unreasonably dangerous in light of its risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Product, as well as other severe and personal injuries which were permanent or lasting in nature.

84. Defendants withheld material information from the medical community and the public in general, including Cathy Brooks, regarding the safety and efficacy of the Product.

85. Defendants knew and recklessly disregarded the fact that the Product caused debilitating and potentially life-altering complications with greater frequency than feasible alternative methods and/or products used to treat SUI.

86. Defendants misstated and misrepresented data, and continue to misstate and misrepresent data, so as to minimize the perceived risk of injuries caused by the Product.

87. Notwithstanding the foregoing, Defendants continue to aggressively market the Product to consumers, without disclosing the true risks associated with the Product.

88. Defendants knew or should have known of the Product's defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the Product so as to maximize sales and profits at the expense of the health and safety of the public, including Cathy Brooks.

89. Defendants continue to conceal and/or fail to disclose to the public, including Cathy Brooks, the serious complications associated with the use of the Product to ensure continued and increased sales of the Product.

90. Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff respectfully demands that this Honorable Court enter judgment against Defendants, jointly and severally, for damages together with costs of this action, and demand trial by jury of all issues raised herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Cathy Brooks respectfully demands judgment against Defendants, jointly and severally, and request compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

1. Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

2. Restitution and disgorgement of profits;

3. Reasonable attorneys' fees;

4. The costs of these proceedings;

5. All ascertainable economic damages;

6. Punitive damages; and

7. Such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff respectfully demands a jury trial on all issues so triable.

By:   /s/ Elizabeth M. Wilkins
Roger C. Denton
Kristine K. Kraft
Elizabeth M. Wilkins
SCHLICHTER, BOGARD & DENTON
100 S. 4th Street, Suite 900
St. Louis, MO 63102
Telephone: 314-621-6115
Facsimile: 314-621-7151
rdenton@uselaws.com
kkraft@uselaws.com
bwilkins@uselaws.com

*ATTORNEYS FOR PLAINTIFF*